IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| OK SALES, INC., an Oklahoma corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No.  08-CV-24-TCK-TLW |
| | ) | |
| | ) | |
| CANADIAN TOOL & DIE, LTD., | ) | |
| a Canadian corporation, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION AND ORDER</u>

Before the Court is Defendant Canadian Tool & Die, LTD.'s Motion for Summary Judgment

or Partial Summary Judgment (Docs. 60, 65); and Plaintiff's Motion for Partial Summary Judgment

Relating to Plaintiff's Claims of Breach of Contract and Declaratory Judgment (Doc. 71).

I.      Background

Plaintiff OK Sales, Inc. ("OKS") is an Oklahoma corporation that represents various

manufacturers and markets these manufacturers' products to potential customers.  The principals of

OKS are David Wheeler ("David"), who is President of OKS, and Erin Wheeler ("Erin"), who is

David's daughter and Vice President of OKS.  Defendant Canadian Tool and Die, LTD. ("CTD")

is a Canadian corporation that manufactures industrial products such as hubs, wheels, and hydraulic

cylinders ("cylinders").  James Umlah ("Umlah") is the President of CTD.

A.      2003 MRA

In 2003, Erin informed CTD that she knew of a Tulsa-based company, Auto Crane Company

("Auto Crane"), that purchased cylinders.  Erin arranged a meeting that was attended by Erin, a CTD

representative, and an Auto Crane representative.  Following this meeting, OKS and CTD entered

into a Manufacturer's Representative Agreement dated December 11, 2003 ("2003 MRA").  The

2003 MRA authorized OKS to solicit business on a non-exclusive basis for CTD at Auto Crane and provided that CTD would pay a maximum commission of five percent of the "net sales value of the business secured by [OKS] and accepted by [CTD]." (Ex. 13 to Pl.'s Resp. to Def's Mot. for Summ. J.) The 2003 MRA is a standard form contract used by OKS. Erin retrieved the contract from a file cabinet, filled in certain provisions by hand, and then faxed it to CTD for approval. Because Auto Crane considered CTD's prices too high and because it was satisfied with its current cylinder supplier, OKS did not sell any CTD products to Auto Crane in 2003 or 2004.

  B. 2005 MRA

  In 2005, Auto Crane had problems with its cylinder supplier, and Erin began pursuing the Auto Crane account on behalf of CTD. On or around November 16, 2005, OKS and CTD entered into a second Manufacturer's Representative Agreement ("2005 MRA"), which states that it is an "update to" the "original agreement signed on December 11, 2003." (Ex. 3 to Pl.'s Mot. for Summ. J.)[1] The 2005 MRA authorized OKS to solicit business on an exclusive basis for CTD at Auto Crane and provided that CTD would pay a maximum commission of three percent of the "net sales value of the business secured by [OKS] and accepted by [CTD]." (*Id.*) The form used for the 2005 MRA was retrieved by Erin from her computer, and she filled in the blanks by typing them in on her computer.[2] Around December 2005 or early 2006, Auto Crane began purchasing cylinders from CTD, and OKS began receiving regular commission checks from CTD.

---

[1] There is conflicting record evidence regarding whether Umlah or Erin originated the term "update" to describe the 2005 MRA. However, CTD does not dispute, for purposes of the motions pending, that Erin originated and inserted the term "update" into the 2005 MRA.

[2] This form was an updated version of OKS' standard contract that was used for the 2003 MRA.

C.      Non-Renewal of the 2005 MRA

In 2007, Kris Nelson ("Nelson"), the Director of Purchasing/Procurement for Auto Crane,

complained to CTD employee Rick Bell ("Bell") that Auto Crane was not benefiting from its

relationship with OKS because Auto Crane was dealing directly with CTD regarding cylinder

purchases.  Based on this conversation with Nelson, Bell explored CTD's options regarding

termination or non-renewal of the 2005 MRA.  On December 6, 2007, Bell sent an email to OKS

confirming its "decision to not renew our Manufacturer's Representative Agreement which expires

on December 11, 2007."  (Ex. 4 to Pl.'s Mot. for Summ. J.)  The reason given for the non-renewal

was "the request of our customer Ramsey Industries [parent company of Auto Crane], to conduct

business directly with suppliers in order to achieve strategic long-term relationships."  (*Id.*)

On January 15, 2008, OKS filed suit in this Court asserting two legal claims: (1) breach of

contract, which claim is based on a theory of "breach of contract and/or anticipatory repudiation"

(Compl. ¶ 15); and (2) unjust enrichment.[3]  OKS also asserted two equitable claims: (1) for a

declaratory judgment regarding the parties' rights and obligations under the 2005 MRA; and (2) for

an "accounting concerning all information underlying the payment of commissions, including, but

not limited to, all orders on [CTD's] books at the date of notification and termination of the [2005

MRA], and an order requiring [CTD] to account for all orders placed during the four year

termination period" (Compl. ¶ 24).

---

[3]     On September 3, 2008, during a discovery hearing before Magistrate Judge Sam Joyner,
OKS stated its intent to dismiss the unjust enrichment claim.  In addition, the parties have
not addressed this claim in their briefs.  Accordingly, OKS has abandoned this claim, and
it is hereby dismissed.

D.     Parties' Motions for Summary Judgment

OKS moved for partial summary judgment as to its claims for breach of contract and declaratory judgment.  In its motion for partial summary judgment, OKS seeks a declaration that: (1) OKS is entitled to post-termination commissions from a period of December 6, 2007 (the date of CTD's non-renewal of the contract) until December 6, 2011 (the expiration of a four-year post-termination commission period set forth in the 2005 MRA); and (2) commissions are due to OKS on "orders placed" by Auto Crane (more aptly described as "reorders") of twenty-two cylinders that were originally "solicited" by OKS.  OKS also seeks judgment as a matter of law that CTD is in breach of the 2005 MRA because it has failed to pay any commissions for orders placed after December 6, 2007.  OKS has not moved for summary judgment as to any specific amount of commissions owed.

CTD moved for summary judgment as to all claims asserted against it, or, alternatively, for partial summary judgment.  CTD contends that is entitled to judgment as a matter of law on OKS' claim for breach of contract because:  (1) CTD was not obligated to pay OKS any commissions after December 6, 2007 (the date of CTD's non-renewal of the contract); (2) any obligation to pay OKS commissions after December 6, 2007 was excused based on OKS' breach of the 2005 MRA; (3) OKS cannot maintain a claim for anticipatory repudiation; and (4) "solicited," as used in the 2005 MRA, requires active solicitation by OKS even following termination of the agreement.  The parties agree that Oklahoma law governs interpretation of the relevant agreements.

## II.   Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving

4

party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.*; *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) (stating that a court "must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues"). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient to establish the existence of those elements essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-33 (1986). "Where different ultimate inferences may properly be drawn, the case is not one for a summary judgment." *Seamons*, 206 F.3d at 1026 (quoting *Luckett v. Bethlehem Steel*, 618 F.2d 1373, 1377 (10th Cir.1980)). In this case, the parties have filed cross motions for summary judgment as to certain contract interpretation issues. Therefore, the Court is "entitled to assume that no evidence needs to be considered other than that filed by the parties." *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997). However, "summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Id.*

### III.    Whether the 2005 MRA Supersedes or Amends the 2003 MRA

CTD's position that the 2005 MRA expired on December 6, 2007 rests on the initial legal assumption that the 2005 MRA functioned as an amendment to the 2003 MRA rather than a replacement of the 2003 MRA. Such an assumption is necessary to CTD's position because, in order for the 2005 MRA to have expired as of December 6, 2007, the beginning date for the 2005

5

MRA must be December 3, 2003 (execution date of the 2003 MRA) and not November 16, 2005 (execution date of the 2005 MRA). Conversely, OKS contends that the 2005 MRA replaced and superseded the 2003 MRA and that the start date of the 2003 MRA has no impact on the 2005 MRA.

"The existence of a substituted contract is a question of law for the court in cases in which a written agreement is involved." *Comeau v. Mt. Carmel Med. Ctr., Inc.*, 869 F. Supp. 858, 863 (D. Kan. 1994). Under Oklahoma law, "[w]here the parties to an existing contract enter into a new agreement, completely covering the same subject-matter, but continuing terms which are inconsistent with those of the earlier contract, so that the two cannot stand together, the effect is to supersede and rescind the earlier contract, leaving the later agreement as the only agreement of the parties on the subject." *Rose v. Roberts*, 161 P.2d 851, 853 (Okla. 1945); *see also Richardson v. Mustang Fuel Corp.*, 772 P.2d 1324, 1326 (Okla. 1989) ("[I]n order for a later contract to operate as a rescission of a former agreement, its terms must cover fully the subject matter of the original agreement."). *Cf. B-S Steel of Kan., Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 661 (10th Cir. 2006) (applying Kansas law) (explaining that contracting parties have the prerogative to "substitute an entirely new contract for a previous one, particularly where the modified or new contract is in writing and is valid in all other respects").[4]

---

[4] This rule is consistent with the Restatement (Second) of Contracts and case law from other jurisdictions. *See* Restatement (Second) of Contracts § 279 (1981) ("A substituted contract is one that is itself accepted by the obligee in satisfaction of the original duty and thereby discharges it."); *see also Trugreen Cos. LLC v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 950 (D. Utah 2007) (applying Utah law) (explaining that "[i]n order for a contract to be merged into another, it must be plainly shown that such was the intent of the parties; and this is usually where the later contract fully covers an earlier one" and that "the new contract must either explicitly rescind the earlier contract, deal with the subject matter of the former contract so comprehensively as to be complete within itself and to raise the legal inference of substitution, or present such inconsistencies with the first contract that the two cannot in any substantial respect stand together").

The Court concludes, based on the four corners of the documents, that the 2005 MRA replaced and superseded the 2003 MRA. Upon review of both agreements, there can be no question that they cover the same subject matter – namely, CTD's authorization for OKS to solicit business from Auto Crane on its behalf in exchange for a sales commission. Both agreements are entitled "Manufacturer's Representative Agreement," and both agreements authorize OKS to "solicit business" "for [CTD] at Auto Crane Co." Both agreements contain four subheadings entitled "COMMISSIONS," "PAYMENT OF COMMISSIONS," "EXPENSES," and "TERMINATION," demonstrating that the agreements not only cover the same subject matter but also cover the same specific topics related to that subject matter. In addition, the two agreements contain inconsistent terms and cannot stand together. For example, the commission rate in the 2005 MRA is three percent, while the commission rate in the 2003 MRA is five percent. The solicitation of Auto Crane on behalf of CTD is "non-exclusive" in the 2005 MRA, while it is "exclusive" in the 2003 MRA. In sum, the 2005 MRA is not a mere "modification" or "amendment" because all topics covered in the 2003 MRA are also covered in the 2005 MRA, and there would no occasion to refer back to the 2003 MRA to discern the rights and obligations of the parties. Further, the two documents are inconsistent in their terms and cannot be interpreted as one integrated document.

The only language potentially supporting CTD's position is asterisked language at the end of the 2005 MRA, stating that the document is an "[u]pdate to original agreement signed on December 11, 2003." CTD places great weight on use of the word "update" and argues that such word mandates construction of the 2005 MRA as an amendment or modification to the 2003 MRA. However, use of the word "update" is not sufficient to overcome the otherwise overwhelming evidence in support of a finding of substitution. In addition, the word "update" is not necessarily

inconsistent with a substitution or replacement.  Had the alleged "update" covered only one topic in the 2003 MRA, CTD's argument would be more persuasive.  However, the "update" in this case covered the entirety of the first agreement and clearly functioned as a substitute thereof.  Accordingly, the 2005 MRA is a stand-alone agreement that superseded and replaced the 2003 MRA.

## IV.     Meaning of Phrases "4-Year Period" and "4-Year Termination Period"

The parties sharply dispute the meanings of the phrases "the 4 year period" and the "4 year termination period" used in the "TERMINATION" provision of the 2005 MRA ("termination provision").  The termination provision states, in relevant part:

> TERMINATION:  This contract is intended to continue on a year-to-year basis contingent on the mutual satisfaction of the contracting parties.  However, the contract may be terminated by either party giving 90 day written notice to the other party and shall automatically terminate at the expiration of the *4 year period.* Payment of commissions will continue to [OKS] by [CTD] for all orders on the books at the date of notification of termination as well as on orders placed during the *4 year termination period* that were solicited by [OKS].

(Ex. 3 to Pl.'s Mot. for Summ. J (emphasis added).)  CTD contends that this four-year time period is the duration of the contract and that the 2005 MRA automatically expires four years from its start date.  Based on the Court's ruling in Part III that the 2005 MRA superseded the 2003 MRA, the start date of the 2005 MRA is November 16, 2005, and not December 11, 2003.[5]  Thus, pursuant to the Court's ruling and CTD's argument regarding the meaning of the "4 year period," CTD's argument necessarily becomes that the 2005 MRA automatically expires on November 16, 2009.  In contrast,

---

[5]     The Court rejected CTD's position that the start date of the 2005 MRA was the execution date of the 2003 MRA and has necessarily rejected CTD's argument that the expiration date of the 2005 MRA was December 11, 2007.  Nonetheless, the Court must resolve the meaning of the "4 year period" because it impacts other aspects of CTD's potential liability.

OKS contends that the "4 year period" has nothing to do with the duration of the contract. Instead, according to OKS, the "4 year period" refers to the length of time CTD owes OKS commissions following either party's voluntary termination of the agreement.

As an initial matter, the Court finds that this term is not ambiguous and can be decided based on examination of the four corners of the instrument. *See GEICO Gen. Ins. Co. v. Nw. Pac. Indem. Co.*, 115 P.3d 856, 858 (Okla. 2005) (quotations omitted) ("Whether a contract is ambiguous and hence requires extrinsic evidence to clarify the doubt is a question of law for the courts."). For reasons explained in detail below, the "4 year period" in the 2005 MRA is not reasonably susceptible to two different constructions and reasonably intelligent men would not honestly differ as to the proper meaning of the "4 year period." *See Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1102 (10th Cir. 2007) (internal quotations and alterations omitted) (explaining that, under Oklahoma law, "[a] contract is ambiguous if it is reasonably susceptible to at least two different constructions" such that "reasonably intelligent men on reading the contract would honestly differ as to its meaning" and further explaining that an agreement is not ambiguous simply because the parties argue for a different construction). When the 2005 MRA is read in its entirety and the words are given their plain and ordinary meaning, there is only one reasonable interpretation of the "4 year period." *See id.* (quoting *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541, 546 (Okla. 2003)) ("To determine whether a contract is ambiguous, a court must look to the language of the entire agreement, which must be 'given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept.'"). Further, although the 2005 MRA arguably contains repugnant clauses, the Court finds that such clauses are not in "irreconcilable conflict" and that such clauses can be reconciled by a reasonable construction. *See*

9

*Campbell v. Indep. Sch. Dist. No. 01 of Okmulgee County, Okla.*, 77 P.3d 1034, 1039-40 (Okla. 2003) (holding that "[w]here a contract contains clauses seemingly repugnant to each other, the repugnant clauses must be reconciled if it can be done by any reasonable construction"); Okla. Stat. tit. 15, § 168 ("Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clause, subordinate to the general intent and purposes of the whole contract."). Accordingly, the Court need not consider extrinsic evidence in deciding the meaning of the "4 year period." *See Otis Elevator*, 483 F.3d at 1101 (quoting *Pitco Prod. Co.*, 63 P.3d at 546) ("'[I]f a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended.'"); *Campbell*, 77 P.3d at 1039 ("There is no need to resort to extrinsic evidence to ascertain a contract's meaning where its language is clear and explicit.") (explaining that court need only resort to extrinsic evidence if there is an "irreconcilable conflict" between two repugnant contract provisions).

The Court rejects CTD's interpretation of the four-year period as setting forth the duration of the agreement. In support of its position, CTD seizes on the language "and shall automatically terminate at the expiration of the 4 year period" and argues that such language indicates an automatic contract expiration four years after the start date. However, this interpretation ignores the context and surrounding language. First, it ignores the first sentence of the termination provision, which clearly sets forth the duration of the contract as continuing indefinitely from year to year with no automatic expiration period. The next sentence of the termination provision sets forth how the otherwise indefinite contract may be terminated, *i.e.*, by ninety days written notice to the other party. Second, CTD's interpretation ignores the article "the" before use of the phrase "4 year period." Use of "the" begs the question - what four year period? This question is answered in the very next

10

sentence, which provides that CTD shall owe OKS commissions for certain orders on the books at the time of notification of termination as well as an orders placed during "the 4 year termination period." Thus, the first use of the "4 year period" must be understood in relation to the explanation provided in the next sentence.

CTD's interpretation, which requires isolating one phrase and ignoring the context, would render the surrounding sentences to have no discernable meaning. Most importantly, the third sentence of the termination provision, which is clearly intended to have some meaning regarding commissions owed, would cease to have any practical effect under CTD's interpretation. If the "4-year period" simply refers to the life of the contract, *i.e.*, the start date to the termination date, the third sentence becomes redundant with the contract as a whole, which already requires a three-percent commission to OKS during the life of the contract. There would be no need to specify that commissions would "continue" "on orders placed during the 4 year termination period" if the four-year termination period simply referred to the life of the contract. Accordingly, based on examination of the four corners of the document, the Court finds that the "4-year period" does not refer to the duration of the 2005 MRA but instead refers to the post-termination period during which OKS is entitled to commissions.

Read together and in context, these three sentences can have only one reasonable interpretation, which is the interpretation urged by OKS: (1) the contract is of an indefinite duration; (2) the contract can be terminated by either party by giving ninety days notice; (3) CTD must continue paying commissions for orders "on the books" at the date of notification of termination and on orders "placed during the 4 year termination period that were solicited by [OKS]," and (4) commissions are owed for a period of four years following termination by either party on any

11

qualifying "orders" placed by Auto Crane.[6]  This interpretation, and only this interpretation, gives

effect to all language in the contract.  *See* Okla. Stat. tit. 15, § 157 ("The whole of a contract is to

be taken together, so as to give effect to every part, if reasonably practicable, each clause helping

to interpret the others.").[7]

CTD contends that the final sentence of the 2005 MRA is wholly contrary, and therefore

repugnant, to the Court's interpretation set forth in the paragraph above.  This language is contained

under the "TERMINATION" subheading.  It is a separate, but non-indented, paragraph providing:

> Both parties shall by execution of this agreement covenant and agree that all
> references with respect to the other party shall be in only the most positive
> description.  Any disagreements or grievances shall be communicated and dealt with
> internally and that any breach of this practice shall be considered a breach of this
> agreement in whole.  Furthermore, *any termination under this clause shall have the
> effect of discontinuing any and all payments, including but not limited to financial
> obligations to the aggrieved party.*

(Ex. 3 to Pl.'s Mot. for Summ. J (emphasis added).)  CTD contends that this final sentence negates

any requirement set forth in the third sentence of the termination provision that may require the

payment of post-termination commissions.  Specifically, CTS argues that "this clause" refers to the

---

[6]   The "4-year termination period" would have been a more aptly described as the "4-year post-termination period."  Nonetheless, the intent of the parties is clear that the four-year period commences upon either party's notice of termination.

[7]   Post-termination commissions do not appear to be uncommon in manufacturer's representative agreements.  *See AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 609 (7th Cir. 2008) (interpreting agreement between manufacturer and sales representative that provided for post-termination commissions for a five-year period).  In fact, courts have held that post-termination commissions may be due even in absence of express contractual language such as that presented in the 2005 MRA.  *See, e.g., Urban Assocs. v. Standex Elec., Inc.*, No. 06-1279, 2007 WL 328789, at * 11 (6th Cir. Feb. 1, 2007) (holding that fact finder could conclude that parties intended sales representative to receive post-termination commissions at least for the life of the purchase orders that were received prior to the termination date, even in absence of an express contractual provision).

entire termination provision rather than merely the prior two sentences, *i.e.*, that any termination whatsoever has the effect of suspending all payments due, including post-termination commissions.

CTD's proposed construction is contrary to Oklahoma law because it renders the third sentence of the termination provision wholly meaningless. *See* Okla. Stat. tit. 15, § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others."). If post-termination commissions are never owed upon any type of termination, there is no reason to set forth terms upon which certain post-termination commissions must be paid. However, both sentences can be given effect under OKS' interpretation. If the final sentence of the 2005 MRA is construed as applying only to terminations that occur for a violation of obligations set forth in that separate (although non-indented) paragraph – namely, the duties to refer to the other party in the most positive description and to communicate and deal with certain grievances internally, then the third sentence of the termination provision continues to have meaning. Thus, OKS' proposed interpretation is proper.

In addition, the parties' use of the word "aggrieved" in the final sentence supports the Court's conclusion that such sentence is limited to terminations related to the prior two sentences and not to "standard" ninety-day terminations, which can be without cause and which would not involve any "aggrieved" party. Finally, although this paragraph is not indented and does not contain a separate heading, this clause is set apart as a new section, is in a different font, covers new rights and obligations, and is clearly intended as a stand-alone provision. *See Otis Elevator,* 483 F.3d at 1101 (quoting *In re Kaufman*, 37 P.3d 845, 853 (Okla. 2001)) ("'[T]he cardinal rule in contract interpretation is to determine and give effect to the intent of the parties.'"). Therefore, the Court construes "this clause" in the final sentence of the 2005 MRA as referring to the prior two sentences

13

and not to *any* type of termination. The final sentence of the 2005 MRA can therefore be reasonably interpreted in a manner that is not repugnant to the Court's interpretation of "4-year period" as a period following termination of the agreement during which OKS may be entitled to commissions. *See* Okla. Stat. tit. 15, § 168 ("Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clause, subordinate to the general intent and purposes of the whole contract.").[8]

## V.   Whether OKS Is in Breach of the "Internal Grievance" Language

CTD argues that, even if it misinterpreted the termination provision, there is no genuine dispute that OKS breached the MRA by refusing to deal with CTD "internally" prior to filing this lawsuit. The relevant language is set forth in the last three sentences of the 2005 MRA. As explained above in Part IV, it is a separate, but non-indented, paragraph under the "TERMINATION" subheading. It provides:

> *Both parties shall by execution of this agreement covenant and agree that all references with respect to the other party shall be in only the most positive description. Any disagreements or grievances shall be communicated and dealt with*

---

[8]   CTD argues that the last, non-indented paragraph of the 2005 MRA was expressly added by CTD and therefore "controls" over any contrary language contained in the standard "form" originally utilized by Erin in preparing the contract. *See, e.g.*, Okla. Stat. tit. 15, § 167 ("Where a contract is partly written and partly printed, or where part of it is written or printed under the special directions of the parties, and with a special view to their intention, and the remainder is copied from a form originally prepared without special reference to the particular parties and particular contract in question the written parts control the printed parts, and the parts which are purely original control those which are copied from a form. And if the two are absolutely repugnant, the latter must be so far disregarded."). However, "this rule of construction is only utilized in the event the written provisions conflict with the preprinted provisions." *McClain v. Ricks Expl. Co.*, 894 P.2d 422, 428 (Okla. Civ. App. 1994). "Where a contract is complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended." *Id.* As explained above, the Court finds that both sentences can be given their intended meaning and that the contract is complete in itself.

> *internally and that any breach of this practice shall be considered a breach of this*
> *agreement in whole.*  Furthermore, any termination under this clause shall have the
> effect of discontinuing any and all payments, including but not limited to financial
> obligations to the aggrieved party.

(Ex. 3 to Pl.'s Mot. for Summ. J (emphasis added).)  CTD argues that a "disagreement" and

"grievance" arose on December 6, 2007, when Bell informed OKS that CTD was not renewing the

2005 MRA.  CTD further argues that there can be no genuine dispute that OKS refused Bell's

request to discuss their disagreement before filing suit on January 15, 2008.  Therefore, OKS

breached the obligations set forth above.  In contrast, OKS argues that the 2005 MRA does not

impose an obligation to negotiate or discuss a termination (or non-renewal) because the "2005 MRA

clearly allows either party to terminate upon 90 days written notice."  (Pl.'s Resp. to Def.'s Mot. for

Summ. J. 15.)  OKS further contends that, in his deposition, Umlah never identified failure to

negotiate as a potential breach and that this argument is a last-ditch, contrived attempt by CTD to

avoid its obligations under the 2005 MRA.  (*Id.* 12.)

    The following facts, which describe the events leading to OKS filing suit and allegedly

breaching the 2005 MRA, are not disputed.  On December 6, 2007, Bell sent an email to

"oksalesinc@aol.com," stating:

> As per my conversation of today, I wish to confirm our decision to not renew our
> Manufacturer's Representative Agreement which expires on December 11, 2007.
> The reason for this decision is based on the request of our customer Ramsey
> Industries [parent company of Auto Crane], to conduct business directly with
> suppliers in order to achieve strategic long-term relationships.

(Ex. 4 to David Wheeler Dep., Ex. B to Def.'s Mot. for Summ. J.)  On December 14, 2007, David

responded:

> I was out of town and we have been without power most of the week . . . However,
> we have reviewed your email from 12/6/07 and would like to correct some of the
> information to which you referred:

> The original agreement was dated 12/11/03 but was updated by a new contract dated
> 11/16/05.  This is the contract we are looking at now.  We can consider your email
> from 12/6/07 to be your 90 day written notice of termination but no mention was
> made of the 4 year termination clause.  Please confirm that CTD intends to honor the
> agreed upon terms.
>
> In closing, I would like to mention the fact that Erin used her contacts and several
> years work to secure this substantial account for CTD and always worked in a very
> professional manner.  Any of the rest of our vendors would have, in the face of a
> customer approaching them with a similar situation, insisted on the keeping the reps
> to service the account.

(*Id.*)  On December 28, 2007, Bell responded to David:

> Sorry for my delay in getting back to you as I was also away.  As far as our notifying
> [OKS] that we [CTD] will not renew the agreement, we feel that we have correctly
> interpreted the agreement.  I will be visiting Tulsa Jan. 16-17 and am prepared to sit
> with you to discuss this issue.

(*Id.*)  On January 2, 2008, Erin sent an email to Bell, stating: "Please provide an agenda for a meeting.  Also - Dave is faxing another copy of the current contract to your attention.  The terms are clear so we would like to know what there is to discuss." (*Id.*)  On January 15, 2009, OKS filed this lawsuit, and the meeting referenced in these emails never occurred.  When asked in his deposition why he did not meet with Bell prior to filing suit, David responded:  "We said what's there to discuss, they have already fired us.  The only thing we're concerned about is our four-year termination clause, and we couldn't him [sic] at that point in time to say anything about it . . . Well, they had already fired us . . . what were we going to gain from it, I mean it was a waste of his time, a waste of our time."  (David Wheeler Dep. 104-05, Ex. B to Def.'s Mot. for Summ. J.)

The Court concludes that OKS' action of filing suit upon learning of CTD's termination, or non-renewal, did not breach the 2005 MRA.  Based on the four corners of the document, the Court interprets the disputed phrase – "[a]ny disagreements or grievances shall be communicated and dealt with internally and that any breach of this practice shall be considered a breach of this agreement

16

in whole" – as having a more limited meaning than that urged by CTD. A more limited meaning is consistent with the context of this clause, which the Court has interpreted as a separate, stand-alone clause related primarily to the duty to avoid making disparaging remarks about the other party. The preceding sentence states that "[b]oth parties shall . . . covenant and agree that all references with respect to the other party shall be in only the most positive description." This preceding sentence provides context for the next sentence relating to "disagreements or grievances" needing to be discussed and "dealt with" internally. The intent of the parties was to create a duty to discuss disagreements between the sales representative and the manufacturer internally, rather than making disparaging remarks in the first instance to the customer. Read in context, it becomes clear that CTD is attempting to graft a broader meaning upon this phrase than the parties intended.

Further, if this provision were interpreted to require the parties to negotiate a termination of the agreement, such a reading would be inconsistent with the ninety-day notice provision contained in the previous paragraph. Under CTD's interpretation, a party receiving a standard ninety-day notice of termination would be required to have an internal discussion or negotiation regarding the other party's termination of the contract. As expressed by David in his deposition, what would be the point of such discussion since a party has an automatic right to terminate the agreement at any time with ninety-days notice? Under CTD's strained interpretation, CTD had the right not only to terminate the contract but also to hold OKS liable for breach upon its refusal to meet with them regarding its termination prior to filing a lawsuit.[9] The Court finds that CTD's proposed

_____

[9]     Careful review of the undisputed facts reveal that the "meeting" requested by Bell was to discuss whether CTD had the right of termination or "non-renewal" and not whether CTD was obligated to pay post-termination commissions. In his email requesting a meeting, Bell stated that CTD had decided not to renew, had "correctly interpreted the agreement," and was "prepared to sit with [OKS] to discuss *this issue*." (Ex. 4 to David Wheeler Dep., Ex.

construction is not consistent with the contract as a whole and does not reflect the intent of the parties in including the "internal grievance" language in the last paragraph of the 2005 MRA. Therefore, the Court finds, as a matter of law, the OKS is not in breach of the "internal grievance" language in the 2005 MRA simply because OKS representatives failed to meet with CTS representatives prior to filing this lawsuit.[10]

---

B to Def.'s Mot. for Summ. J. (emphasis added).)

[10]   Two of CTD's cited cases are factually distinguishable because they involved an explicit agreement to negotiate a contract term in the future or an explicit agreement to submit disputes to a third party prior to commencing litigation. *See Surface Materials Sales, Inc. v. Surface Protection Indus., Int'l*, 386 F. Supp. 2d 836, 838-40 (N.D. Ohio 2005) (agreement required that, in the event the agreement was terminated without cause by the defendant, the defendant would "negotiate in good faith with [the plaintiff] to pay [the plaintiff] a termination fee") (observing, in dicta, that a party could be held liable for failing to reach an ultimate agreement on the termination fee only if such failure resulted from a breach of that party's obligation to negotiate); *Mayfair Constr. Co. v. Waveland Assocs. Phase I*, 619 N.E.2d 144, 153-54 (Ill. App. 1993) (agreement required the parties to initially submit disputes to an architect for resolution) (holding that party failing to do so was in breach because it "deprived [the other party] of the bargained-for right to quick resolutions by a third party with specialized experience in construction issues"). CTD's other cited case is not persuasive because it lacks sufficient factual information to compare it to the case at bar. *Cotton v. Otis Elevator Co.*, 627 F. Supp 519 (S.D.W. Va. 1986) (finding that party stated claim for breach of contract based on failure to negotiate contractual disputes in good faith but not setting forth relevant contract term).

VI.     **Whether OKS Can Seek Damages for Total Breach Based on the Doctrine of Anticipatory Repudiation**

In its Complaint, OKS asserts a cause of action for "breach of contract," alleging that it is entitled to damages based on CTD's "breach of contract and/or anticipatory breach of contract." (Compl. ¶ 15.)  OKS alleges:

> [CTD] has definitively and unequivocally stated its intent that it will not perform the Agreement at the time fixed for performance and will not pay the commissions due under the Agreement. [CTD's] statements and conduct constitute an anticipatory breach and repudiation of the Agreement.  The commissions due and owing have not been paid and, therefore, [CTD] has breached the Agreement with respect to past due commissions.

(*Id.* ¶ 13.)  Thus, OKS alleges that CTD is liable for breach of the 2005 MRA based on the doctrine of anticipatory repudiation and based on its actual failure to make commission payments that were due and owing from December 6, 2007 through the date of trial.  CTD has moved for summary judgment on OKS' anticipatory repudiation theory, arguing that (1) the doctrine of anticipatory repudiation does not apply because OKS has fully performed under the 2005 MRA; and (2) CTD's actions did not qualify as a clear and unequivocal refusal to perform the 2005 MRA because its actions were based on a good-faith interpretation of the contract.

In general, "[t]he doctrine of anticipatory repudiation applies to a bilateral, executory contract, and a party who makes a distinct, unequivocal, and absolute declaration of an intent not to perform." *Bourke v. W. Business Prod., Inc.*, 120 P.3d 876, 883 (Okla. Civ. App. 2005) (citing *Bushey v. Dale*, 75 P.2d 193, 196 (Okla. 1937)).  Thus, "where a party to a bilateral contract repudiates the contractual obligation to perform a required act in the future, the other party to the contract may treat the contract as then breached and immediately pursue a remedy for breach of the contract." *Bourke*, 120 P.3d at 883.  However, there is an exception to this rule if there has been

19

"full performance" by the party asserting anticipatory repudiation and the only remaining performance by the other party is the payment of money ("full performance exception"). *See Operators' Oil Co. v. Barbre*, 65 F.2d 857, 861 (10th Cir. 1933) (holding that suit to recover commissions due on oil and gas contracts could not be based on doctrine of anticipatory repudiation because the plaintiff had fully performed its duties and all that "remained to be done under the commission contract" was to "pay the commissions when the oil was or should have been delivered"); Restatement (Second) of Contracts § 243(3) (1981) ("Where at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by non-performance as to less than the whole, whether or not accompanied by or followed by a repudiation, does not give rise to a claim for damages for total breach."); 2 E. Allan Farnsworth, *Farnsworth On Contracts* § 8.18, at 532-33 (3d ed. 2004) ("If, at the time of the breach, the injured party has fully performed and the only remaining duty of performance of the party in breach is to pay money in independent installments, the failure to pay one or more installments does not amount to a total breach that will accelerate the time for payment of the balance of the debt.").  The rationale behind the full performance exception is that the relief afforded by anticipatory repudiation  – to excuse performance by one party when the other party has declared its intent not to perform – is not necessary "where the consideration from the promisee has passed" and "there are no mutual obligations."  *See Operators' Oil Co.*, 65 F.2d at 861.[11]

---

[11]     There exists contrary authority.  *See, e.g., Combs v. Int'l Ins. Co.*, 354 F.3d 568, 600 (6th Cir. 2004) (citing 9 Arthur L. Corbin, *Corbin on Contracts* § 962, at 767 (interim ed.1979)) (internal quotations and alterations omitted) (reasoning that "the harm caused to the plaintiff is equally great whether or not he has already performed; and it seems strange to deny to a plaintiff a remedy for anticipatory breach merely on the ground that he has already fully

The 2005 MRA is a bilateral contract because it embodies "mutual and interdependent obligations between the parties" – namely, CTD's promise to pay commissions in exchange for OKS' solicitation of business from Auto Crane. *See Bourke*, 120 P.2d at 882 (explaining difference between bilateral and unilateral contract). In addition, the disputed portion of the 2005 MRA – CTD's promise to pay commissions on certain "orders" for four years following termination – is executory in that CTD promised to perform at some time in the future. *See id.* (explaining that contract is executory when "one party promises to perform at some time in the future"). Thus, as a bilateral, executory contract, the doctrine of anticipatory repudiation generally applies to the 2005 MRA. *See id.*

However, the Court finds that this case falls into the full performance exception because OKS has fully performed under the 2005 MRA, and OKS seeks recovery for money payments as they come due under the 2005 MRA, *i.e.*, post-termination commission payments. Under OKS' and the Court's interpretation of the 2005 MRA, OKS has fully performed under the 2005 MRA and no longer has the ability or authorization to solicit additional "orders" from Auto Crane that would entitle it to commissions under the 2005 MRA. As more fully explained in Part VIII below, any post-termination commissions to which OKS is potentially entitled were fully earned at the time it filed suit. In addition, the amount of payments potentially due to OKS are unknown until Auto Crane places the relevant "orders," rendering it impossible for the Court or jury to ascertain the amount of commissions due in the future. *See Operators' Oil Co.*, 65 F.2d at 861 (explaining that case presented a "striking example of the soundness" of exception to anticipatory repudiation because, when the suit was filed, the sum sought to be recovered depended on several factors,

---

performed as his contract required").

21

including the amount of oil produced and the price of oil in the future).  Therefore, CTD is entitled

to summary judgment on OKS' claim for anticipatory repudiation, and OKS is limited to suing for

damages (*i.e.*, unpaid commissions) that have accrued at the time of trial.  *See Kozak v. Medtronic,*

*Inc.*, No. H-03-4400, 2006 WL 5207231, at * 2 (S.D. Tex. Sept. 28. 2006) (applying exception set

forth in Restatement (Second) of Contracts § 243(3) and holding that the plaintiff was "limited to

a claim for partial breach and cannot, as a matter of law, presently recover damages for future

royalties" allegedly due under a purchase agreement).[12] [13]

VII.    **Various Issues Related to Whether and to What Extent CTD Owes Post-Termination Commissions for Orders Placed by Auto Crane**

       Both parties have moved for summary declarations that will impact a jury's determination

of whether and to what extent CTD owes OKS post-termination commissions for orders placed by

Auto Crane.[14]  OKS has moved for summary declarations that (1) post-termination commissions are

due on all "orders" or "reorders" by Auto Crane of twenty-two specific cylinders, the sales of which

were originally solicited by OKS, and (2) CTD is in breach of the 2005 MRA because CTD ceased

paying commissions for these "orders" after December 6, 2007.  In the event its other arguments

were unsuccessful, CTD moved for partial summary judgment that the term "solicited" in the 2005

---

[12]     OKS has sought declaratory relief and an "accounting" from CTD regarding the amount of post-termination commissions earned.  These equitable remedies are proper forms of relief regarding any future payments due.  *See* Restatement (Second) of Contracts § 243, cmt. d (explaining ways to alleviate "harsh results" of the exception set forth in § 243(3)) ("Even when the injured party has no claim for damages for total breach, he may be entitled to equitable relief, a declaratory judgment, an installment judgment, or restitution.").

[13]     Based on this holding, the Court does not reach CTD's second argument that its actions did not qualify as a clear and unequivocal refusal to perform the 2005 MRA.

[14]     Neither party has moved for summary judgment.  Thus, OKS has not moved the Court for judgment as to a precise amount owed, and CTD has not moved for summary judgment on grounds that there are no "orders" whatsoever upon which commissions are due.

MRA means "active involvement in procuring a sale." CTD seeks a declaration that OKS must have been actively involved in procuring the post-termination "order" from Auto Crane in order to trigger CTD's obligation to pay a commission. (*See* Combined Resp. and Reply 28 (arguing that third sentence of termination provision means that OKS must "solicit[] Auto Crane to place a given post-termination order" in order to earn a commission).)

> The language that is relevant to these issues is contained in the termination provision:
>
> Payment of commissions *will continue* to [OKS] by [CTD] for all *orders on the books* at the date of notification of termination as well as on *orders placed during the 4 year termination period that were solicited by [OKS].*

(Ex. 3 to Pl.'s Mot. for Summ. J (emphasis added).) In accordance with the Court's other rulings set forth above, the Court construes this term to mean that OKS is entitled to commissions for a four-year period following termination of the 2005 MRA for two types of "orders:" (1) "orders on the books" as of December 6, 2007; and (2) all "orders placed" from December 6, 2007 through December 6, 2011 "that were solicited by [OKS]."[15] With this general construction in mind, the Court turns to the parties' motions for summary declarations.

A.      CTD's Motion for Summary Declaration

The Court rejects CTD's request to define "solicited" in a manner that would require OKS to "actively" solicit business from Auto Crane following termination of the agreement in order to earn post-termination commissions. CTD's interpretation fails to give any meaning to the second type of "orders" upon which OKS can earn a commission following termination of the agreement

---

[15]     CTD appears to have paid OKS commission for at least some "orders on the books" as of the date of termination. However, CTD has admittedly not paid commissions on "orders placed" following termination of the 2005 MRA, apparently based on its position that such orders must have been actively solicited by OKS following termination of the 2005 MRA.

– all "orders placed . . . that were solicited by [OKS]."  The purpose of the 2005 MRA was to authorize OKS to solicit business for CTD at Auto Crane.  Following CTD's termination of the 2005 MRA on December 6, 2007, OKS ceased to have authorization to continue soliciting business on behalf of CTD from Auto Crane.  However, under CTD's proposed interpretation, OKS must have "actively" solicited the "order placed" by Auto Crane during the four-year post-termination period.  It is not possible for OKS to have done so because OKS no longer had authorization to function as CTD's sales representative at Auto Crane.  Thus, the contract language explaining this second type of order upon which post-termination commissions are due would have no meaning.

In addition, CTD's strained interpretation ignores the past-tense "were" in front of "solicited."[16]  The "orders placed" by Auto Crane during the four-year post-termination period for which commissions are due are ones that "were solicited," *i.e.*, solicited at some point prior to termination, by OKS.  Use of the word "were" is consistent with the Court's conclusion that OKS' "solicitation" of the "orders placed" need not, and in fact could not, have occurred during the four-year post-termination period.  Further, CTD's proposed construction is inconsistent with its argument that OKS has "fully performed" the agreement for purposes of anticipatory repudiation.  As urged by CTD, the Court held that OKS has "fully performed" under the 2005 MRA and OKS' entitlement to post-termination commissions depends entirely on past actions by OKS in relation to the current "orders" being placed by Auto Crane.  This holding would be contrary to a holding that OKS must continue "active" solicitation in order to qualify for post-termination commissions.

---

[16]     In addition to repeatedly omitting the term "were" from its argument, in one instance, CTD misquoted the contract by inserting the word "are" in front of "solicited."  (*See* Def.'s Combined Reply and Resp. 28.)  Counsel is cautioned that a material and advantageous misrepresentation raises the inference of intentional conduct.

Accordingly, while an "order placed" must have been "solicited" by OKS, the Court rejects CTD's proposal to define "solicited" in a manner that would require any post-termination solicitation efforts by OKS.[17]

B.   OKS' Motion for Summary Declarations

OKS has moved for summary declarations that (1) post-termination commissions are due on all "reorders" by Auto Crane of twenty-two specific cylinders, the sales of which were originally solicited by OKS, and (2) CTD is in breach of the 2005 MRA because CTD ceased paying commissions for these "orders" after December 6, 2007.   Apparently acknowledging that the meaning of "orders" cannot be discerned from the four corners of the agreement because it is industry specific, OKS submitted extrinsic evidence in support of its position – the affidavit of Erin Wheeler ("Erin Affidavit").   The Erin Affidavit provides:

> The business secured by [OKS] and accepted by CTD is identified through Auto Crane's orders to purchase the hydraulic cylinders solicited by [OKS].   The sales are

---

[17]   The Court's conclusion is based on the contract language and not the common law "procuring cause" doctrine, which provides that commissions may be due on certain sales even if they were not actively solicited by the salesperson if the salesperson was the "procuring cause" of the sale.   *See AA Sales & Assocs., Inc. v. Coni-Seal, Inc.*, 550 F.3d 605, 610 (7th Cir. 2008) (explaining that "the procuring cause rule is merely a default rule and is inapplicable when a contract specifies other bases of fee recovery").   Similarly, it is not necessary for the Court to determine whether the 2005 MRA is a "customer procurement contract" or a "sales procurement contract" because such doctrines are only relevant in determining whether to award commissions based on equitable principles, in the absence of a contractual provision.   *See, e.g., Jack Peddie & Assocs., Inc v. Whitmor Mf'g Co.*, No. 92-1005, 1992 WL 355475, at * 7-8 (6th Cir. Dec. 2, 1992) (explaining difference between "customer procurement contract" and "sales procurement contract" for purposes of determining whether sales representative was entitled to post-termination commissions in absence of express contractual language).   In this case, there is an express contractual provision for the Court and jury to interpret, and these common-law doctrines play no role in determining OKS' entitlement to fees.

25

evidenced by documents known as purchase orders.  When Auto Crane decided to buy these cylinders from CTD, CTD and Auto Crane exchanged a Quotation indicating that CTD was awarded Auto Crane's business for the specified cylinders, generally identified by part number.  The Quotation also identifies the quantity of Auto Crane's business in the specified hydraulic cylinders.  Auto Crane then issues orders for the purchase of the hydraulic cylinder business secured by [OKS] through a document titled Purchase Order, or "PO".  Auto Crane, based on its inventory levels, periodically issues releases to CTD for the shipment of hydraulic cylinders listed in the PO.

. . .

The hydraulic cylinder business secured by [OKS] and accepted by CTD is reflected on the Quotation dated [October 15, 2007],[18] attached hereto as Exhibit "A."  The Quotation also lists the majority of the specific hydraulic cylinders covered by orders that were on the books as of December 7, 2007.  In addition, after December 7, 2007, CTD continued to place orders for these hydraulic cylinders that were solicited by [OKS].  After December 7, 2007, CTD had orders on the books for the hydraulic cylinders solicited by [OKS].  Likewise, after December 7, 2007, Auto Crane has placed orders with CTD covering the hydraulic cylinders through blanket purchase orders.

(Erin Aff. ¶¶ 6, 8, 9, Ex. A to Ex. 1 to Pl.'s Resp. to Def.'s Mot. for Summ. J. (footnote added).)

Essentially, OKS' position is that, until December 6, 2011, OKS is entitled to post-termination commissions every time CTD issues a "release" or "reorder" of any one of the twenty-two hydraulic cylinders identified in the 10/15/07 Quotation.[19]  CTD denied the majority of Erin's statements, repeatedly contending that "OK Sales had ceased soliciting Auto Crane to purchase additional hydraulic cylinders referenced in the [10/15/07 Quotation]."  (*See* Def.'s Combined Reply and Resp.

---

[18]   The Erin Affidavit mistakenly listed the date of this Quotation as December 15, 2007.  The Quotation dated October 15, 2007 is referred to in this Order as the "10/15/07 Quotation."

[19]   As explained in footnote 7, entitlement to post-termination commissions in certain sales situations, whether by contract or by function of common law, does not appear to be uncommon.

26

7-10.)  Thus, CTD denies that all cylinders listed in the 10/15/07 Quotation were, at some point in time, solicited by OKS.[20]

The Court reiterates its holding that "orders" by Auto Crane need not have been actively solicited by OKS post-termination in order to qualify for commissions under the 2005 MRA. However, the Court finds that the remaining questions presented by OKS – including the precise meaning of "orders" and the precise number of relevant cylinders for which "orders" or "reorders" entitle OKS to commissions – cannot be decided based on the record presented.  First, OKS has not offered specific explanation or testimony regarding why the 10/15/07 Quotation is the document identifying the twenty-two cylinders originally "secured" by OKS on behalf of CTD by virtue of its solicitation efforts.  The Court has examined the 10/15/07 Quotation and relevant testimony but still does not have a complete understanding of the nature of this document, by whom and for what

---

[20]    CTD also submitted extrinsic evidence, the Declaration of Darren Lodge ("Lodge Declaration"), stating:

> From and after the summer of 2007 . . . I had some occasional communications with Erin Wheeler at [OKS], in the regular course of my duties, about [CTD's] business dealings with Auto Crane.  However, I did not observe, witness, or otherwise learn about any efforts by Erin Wheeler (or [OKS]) in 2007 to sell or solicit Auto Crane to purchase hydraulic cylinders (or any other products) from [CTD], except as follows: Erin Wheeler accompanied us to a couple of sales mission meetings at Auto Crane, and on a few occasions she contacted me to pass-along some information about Auto Crane, however, when she did so it involved information about which [CTD] was already aware. . . . [I]f Erin Wheeler or anyone else at [OKS] would have been performing sales solicitation efforts (of Auto Crane) on [CTD's] behalf that fact would have come to my attention in the regular course of my duties.

(Lodge Decl. ¶¶ 3-4, Ex. L to Def.'s Combined Reply and Resp.)  To the extent this evidence seeks to show that OKS did not engage in sufficient post-termination efforts to earn a post-termination commission, this evidence is not relevant based on the Court's ruling regarding the meaning of "were solicited," which is explained below.  However, this evidence is relevant in that it creates a factual dispute as to whether the 10/15/07 Quotation accurately reflects cylinders that "were solicited" by OKS, at some point in time prior to termination of the 2005 MRA.

purpose it was produced, or why the twenty-two cylinders listed therein are the relevant cylinders for purposes of determining if commissions are due to OKS.  In addition, OKS has not offered sufficient explanation or evidence regarding the differences and interplay between purchase orders, blanket purchase orders, and subsequent "releases" or "reorders" of the relevant cylinders.  The testimony presented does not provide the Court with an understanding of the industry, the specific results of OKS' solicitation efforts, or the exact process by which "reorders" or "releases" under an original "purchase order" occur.  *Cf. Urban Assocs., Inc. v. Standex Elec., Inc.*, No. 06-1279, 2007 WL 328789, at * 2 (6th Cir. Feb. 1, 2007) (setting forth deposition testimony explaining that a "blanket purchase order" as used in that industry merely specifies a customer's possible quantity requirements but does not obligate the manufacturer to make any parts; instead, such obligations arise when the customer issued a production or release order "against" the blanket purchase order). Finally, CTD's evidence is sufficient to create a factual dispute as to whether the 10/15/07 Quotation accurately reflects twenty-two cylinders that "were solicited" by OKS.  Therefore, insufficient evidence by OKS and factual questions preclude a summary declaration that (1) post-termination commissions are due on all "reorders" by Auto Crane of the twenty-two cylinders identified in the 10/15/07 Quotation, or (2) CTD is in breach of the 2005 MRA.

**VIII.   Conclusion**

Defendant's Motion for Summary Judgment or Partial Summary Judgment (Docs. 60, 65) is GRANTED in part and DENIED in part as set forth herein.  Plaintiff's Motion for Partial Summary Judgment Relating to Plaintiff's Claims of Breach of Contract and Declaratory Judgment (Doc. 71) is GRANTED in part and DENIED in part as set forth herein.

The parties are ORDERED to file Reports to the Court, no later than noon on Thursday, April 2, 2009, identifying any motions in limine (by name and docket number) that are moot based on the Court's rulings in this Order.  If any of the parties' Objections to deposition designations are moot based on the Court's rulings in this Order, the parties are ordered to file revised Objections to deposition designations no later than noon on Thursday, April 2, 2009.

Plaintiff's Unopposed Motion for Extension of Deadlines (Doc. 153) is GRANTED.  Based on rulings set forth in this Order, the Court anticipates the parties will need additional time to submit a Pretrial Order and Final Exhibit Lists and Objections.  Both shall be due Friday, April 3, 2009.  Defendant's Unopposed Motion for Hearing on Pending Motions (Doc. 152) is DENIED.  The Court has ruled on pending motions for summary judgment, and the Court will take arguments on all remaining motions in limine at the pretrial conference scheduled for Tuesday, April 7, 2009.

**IT IS SO ORDERED this 31st day of March, 2009.**

**TERENCE KERN**
**United States District Judge**

29